UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DOUGLAS J. BALL, | CASE NO. C17-5056RBL |
| Plaintiff, | ORDER |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

THIS MATTER is before the Court on the Government's Motion to Dismiss Plaintiff's Claims Pursuant to Fed. R. Civ. P. 12(b)(1) and Rule 56. The Court has reviewed the record, and for set forth during oral argument and the reasons below, the motion is **GRANTED** and the Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

On July 26, 2014, Plaintiff Ball was injured in a motorcycle accident on Skate Creek Road in the Gifford-Pinchot National Forest ("GPNF"). He sued under the Federal Tort Claims Act ("FTCA"). Ball claims the Forest Service ("FS") was negligent in designing, constructing, or maintaining the road where the accident occurred. Specifically, Plaintiff alleges that the road (1) should have had a guardrail; (2) should have had a smooth even surface; and (3) the FS improperly set the speed limit on the road at 45 miles per hour.

The United States argues that the discretionary function exception to the FTCA bars Ball's claims for negligent design, reconstruction, and maintenance of a FS Road. FS employees must exercise their judgment and discretion in managing and maintaining FS Roads in GPNF, based on a multitude of factors, all while balancing and weighing various competing policy considerations that implicate concerns about the environment, public access and safety, resource allocation, topography, and preservation of natural and cultural resources. Several courts have found that these are exactly the type of decisions that Congress has determined should be shielded from liability.

The United States also claims it is entitled to summary judgment on Ball's claim that the FS negligently set the speed limit at 45 miles per hour, because the speed limit on the curve where he crashed was properly set at 25 miles per hour. The speed limit on the FS road where the accident occurred is 35 miles per hour, unless otherwise posted. The area where Ball crashed was clearly marked with a yellow warning sign indicating curves ahead and setting the speed limit at 25 miles per hour for the next mile. Ball testified he was going between 30 and 40 miles per hour when he crashed on the final curve in the one-mile 25 mile per hour zone; he was exceeding the posted speed limit and driving too fast for conditions.

## I.  FACTS

**A.  Roads in the National Forest System.**

Congress mandated the creation of the NFS forest transportation system. It declared that the "construction and maintenance" of an "adequate system of roads and trails within and near the national forests and other lands administered by the FS" is "essential if increasing demands for timber, recreation, and other uses of such lands are to be met," and that such a system is "essential to enable the Secretary of Agriculture ... to provide for intensive use, protection,

development, and management of these lands under principles of multiple use and sustained yields of products and services." *See* 16 U.S.C. § 532.

Through this system, the FS manages the roads under its authority and control. Congress provides funds for the NFS and appropriations are generally used to construct and maintain FS roads and routes. Construction and maintenance work on forest transportation facilities with appropriated funds are used for what is "necessary and economically justified for the protection, administration, development, and multiple-use management of the federally owned lands and resources served." 36 C.F.R. § 212.4(a).

The GPNF is one of the oldest national forests in the United States, and garners an average of 1,210,000 visitors per year. Established in 1908, the GPNF provides clean water, timber, food, wildlife habitat, diverse recreational opportunities, and a place to enjoy solitude in a busy world. The GPNF encompasses 1,368,300 acres, 180,600 of which are wilderness areas, and includes the Cowlitz Valley Ranger District, the Mt. Adams Ranger District, and the Mount St. Helens Monument.

The GPNF has 3,285 miles of roads open to highway-legal vehicles. The GPNF Visitor Guide includes a section on safe driving on Forest System roads:

> Once you know your route, it is important to stay safe! Most roads are gravel, many are narrow, and some are accessible only by high-clearance vehicles. Drive at safe speeds and respect the limitations of your vehicle!
>
> ***
>
> Keep in mind that most roads on the forest are unpaved and many are closed in the winter season. Roads are also subject to heaving and pot holes, thanks to a lot of Freezing and thawing throughout colder months, as well as our abundance of loosely packed soils from volcanic eruptions. Drive slowly and stay safe.

[Pages 3&6]

The Visitor Guide also encourages drivers to obtain a free copy of the Motor Vehicle Use Map ("MVUP"). The 2014 GPNF MVUP explains operator responsibilities:

> Motor vehicle use, especially off-highway vehicle use, involves inherent risks that may cause property damage, serious injury, and possibly death to participants. Drive cautiously and anticipate rough surfaces and features such as snow, mud, vegetation, and water crossings common to remove driving conditions. By your participation, you voluntarily assume full responsibility for these damages, risks, and dangers. Take care at all times to protect yourself and those under your responsibility.

[Page 3].

Skate Creek Road, (also known as Forest Road 52) travels east and west, between Packwood and Elbe. FR 52 travels through low elevation forest following Skate Creek. The forest contains evergreen and deciduous trees and offers fall colors and plenty of cooler temperatures in the summer. The area offers several dispersed camping sites and fishing in the creek. In the winter, FR 52 is frequently closed (and gated) when the snow gets too deep to drive safely. FR 52 is listed on the GPNF website as an opportunity for nature viewing, but visitors are warned: "FR 52 is a paved road that has had low maintenance for a number of years. Please watch your speed. There are a number of slumps and potholes in the road."

"Level 3" FS roads like FS 52 are "open and maintained for travel by a prudent driver in a standard passenger car, but user comfort and convenience are not considered priorities." Level 3 roads are typically low speed, single lane roads with turnouts and spot surfacing. Some roads may be fully surfaced with either native or processed material. Some surface roughness is tolerated on Level 3 roads. User comfort and convenience is a low priority. Level 3 roads have low to moderate traffic volume, typically connect to arterial and collectors roads, a combination of dips and culverts provide drainage, and potholing or wash-boarding may occur. The Guidelines include pictures of typical Level 3 roads.

Because it is not possible to maintain every GPNF road each year, a schedule of road maintenance is developed based on staff input, road classifications, and any unforeseen circumstances. FS employees develop a road maintenance plan, based on the condition of roads within GPNF, and determine which roads require maintenance during the upcoming year. After compiling a complete list of each road that will be maintained in a given year, the FS designates roads that have priority and which must be maintained prior to all other roads. Priority is determined on factors such as safety, road condition, anticipated and historical road use, road surface, and availability of funding for road projects. These maintenance decisions are included in the annual road maintenance plan, and road crews then implement that plan. The plan is fluid must be adaptable when issues or needs emerge throughout the year.

Under the 2014 GPNF Road Maintenance Plan, the highest priority work is based on the operational maintenance level. The Plan's work schedule depends on seasonal and GPNF priorities. Emergency response is the highest priority. Other road maintenance work is performed "as required." The Plan also vests FS employees with discretion to perform road maintenance "as needed." Thus, FS employees have discretion to maintain FR 52 as needed, and as required, after considering all of the competing FS interests, while operating within the budgetary constraints for any given year.

FR 52 was closed the winter of 2013-2014, due to snow levels that made it unpassable. In April, 2014, prior to opening the road for the season, the road crew inspected FR 52 and performed road maintenance consistent with that performed on Level 3 roads. First, they performed surface and roadway maintenance, asphalt surface maintenance, and pothole patching; they used a cold patch to patch any potholes or potholes that are forming. Second, they did surface cleaning; they broomed FR 52 from fog line to fog line. Third, they performed

maintenance on and cleaned the ditch and drainage structures; they cleaned out the ditch lines of the debris that develops over the winter and cleaned all of the inlets and outlets of the culvert so water will flow freely. Fourth, they performed maintenance on signs, traffic control devices and sign markers; they replaced any signs that were unreadable, damaged, or missing. On July 24, 2014, FR 52 was maintained in manner consistent with a Level 3 FS road.

Sarah Rockey, District Engineer for Gifford Pinchot National Forest, testified that the condition of FR 52 on the corner where the accident occurred, as depicted in the pictures Ball took a few days after the accident, was consistent with a Level 3 road. Rockey testified that the entire 17.9 miles of the road that the FS maintains has the type of bumps depicted in the photographs. FR 52 has been a rough road, consistent with the photographs, since Rockey began working at GPNF in 2005. As a result of weather conditions, vehicle traffic, and other factors, FR 52 has always had rough and uneven surfaces and other irregularities consistent with a Level 3 road. On July 26, 2014, Ball embarked on an "annual three pass motorcycle ride" with friends from Yakima through Chinook, Cayuse, and White Pass, returning to Yakima. The trip normally takes between five to six hours. Ball was riding a Harley-Davidson, one friend was riding a Yamaha, and another friend followed in a car. Ball testified that the road conditions were clear and dry; it was "gorgeous." The group decided to take FR 52 toward Paradise, in Mt. Rainier National Park. Somewhere between milepost 13 and milepost 14 Ball's motorcycle bottomed out and he lost control and went down an embankment. Ball testified that he was going 30 to 40 miles per hour at the time of the crash.

## II. STANDARD OF REVIEW

### A. Subject Matter Jurisdiction

Fundamentally, federal courts are of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). "A federal court is presumed to lack jurisdiction in a particular

case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Limits on federal jurisdiction must neither be disregarded nor evaded. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). A plaintiff bears the burden to establish that subject matter jurisdiction is proper. *Kokkonen*, 511 U.S. at 377.

When a defendant challenges jurisdiction "facially," all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal jurisdiction appears from the face of the pleading. *Thornhill Publishing Co. v. General Telephone Electronics*, 594 F.2d 730, 733 (9th Cir. 1979). A defendant may also attack the existence of subject matter jurisdiction apart from the pleadings. In such a case, a court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). Here, the United States' challenge is factual.

**B. Summary Judgment.**

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.*; *see also Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 958 (9th Cir. 2004).

### III. ANALYSIS

**A. Discretionary Function Exception to the FTCA.**

The FTCA waives sovereign immunity allowing tort claims against the government for the negligent or wrongful act or omission of an employee acting within the scope of his or her office or employment. 28 U.S.C. § 1346(b). This waiver of immunity is limited when the government is performing a discretionary function. The discretionary function exception to the FTCA precludes government liability for any claim based upon the exercise or performance, or failure to exercise or perform, a discretionary function or duty, even if the discretion involved is abused. *See* 28 U.S.C. § 2680(a).

The exception restores the government's immunity in situations where its employees are carrying out governmental or regulatory duties. *See Chadd v. United States,* 794 F.3d 1104, 1108 (9th Cir. 2015); *Blackburn v. United States*, 100 F.3d 1426, 1428 (9th Cir. 1996); *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995). Because the waiver of sovereign immunity is jurisdictional, the court lacks subject matter jurisdiction over a claim that falls within the discretionary function exception. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002). The exception applies regardless of whether the government agent was negligent

in his duties, so long as his duties were discretionary. *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

The Supreme Court set forth a two part test to govern application of the discretionary function exception in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and expounded on the test in *United States v. Gaubert*, 499 U.S. 315, 324 (1991). The Ninth Circuit has adopted the *Berkovitz* test. *See Olson v. United States*, 362 F.3d 1236, 1239 (9th Cir. 2004) (overruled on other grounds). The test is:

1. Whether the challenged conduct is discretionary - whether it involves an element of judgment or choice; and

2. Whether the judgment is of the kind that the discretionary function was designed to shield one based on considerations of public policy.

Here, the challenged conduct is FS officials' management and maintenance of FR 52. Ball alleges general negligence in "designing, constructing, and/or maintaining" the road. Ball's administrative claim to the FS claimed that FR 52 was improperly designed, constructed, and maintained, without guardrails and with an uneven surface.

The issue is whether controlling statutes, regulations and administrative policies mandated that FS officials design, construct, and maintain FR 52 in a certain manner. If they do not, then The FS officials' decisions are protected by the discretionary function exception, so long as the decisions were "susceptible" to policy analysis.

Directives are issued through the FS Directive System, which is comprised of the FS Manual ("FSM") and related FS Handbooks ("FSH") published by the Office of the Chief. The FSM relevant to design, reconstruction, and maintenance of FS roads is FSM 7700, Travel Management. The pertinent sections are Chapter 7700 – Zero Code, Chapter 7710 - Travel Planning, and Chapter 7730 - Road Operation and Maintenance. The FSH relevant to design,

reconstruction, and maintenance of FS roads is FSH 7709.59 - Road System Operations and Maintenance Handbook.

FSM 7700 does not contain any mandatory directives directing FS officials to design, construct, and maintain FS roads in a certain manner. Rather, it provides broad policy objectives and "General Considerations" that specifically vest discretion with the FS employees in making decisions regarding management of the Forest transportation system. FS employees have discretion to provide a Forest transportation system that best achieves the desired conditions identified in the applicable land management plan. They are tasked with identifying the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of NFS lands. They give priority to maintaining and reconstructing the most heavily used roads to provide safe and efficient travel and to reduce environmental impacts.

FSM 7710 does not contain any mandatory directives directing FS officials to design, construct, and maintain FS roads in a certain manner. Instead, it gives FS employees discretion to:

(1) provide for a safe and cost-effective transportation system;

(2) provide for orderly improvement and management of the forest transportation system;

(3) determine the minimum road system needed for sustainable public and agency access to achieve the desired conditions in the applicable land management plan to promote ecosystem health; and to address public safety and efficiency of operations in an environmentally sensitive manner within current and anticipated funding levels;

(4) determine appropriate motor vehicle uses of NFS roads;

(5) designate NFS roads for motor vehicle use;

(6) provide for and manage an appropriate range of motorized recreational experiences, while minimizing conflicts among uses; and

(7) provide access for the use and enjoyment of NFS lands.

FSM 7730 also does not contain any mandatory directives directing FS officials to operate and maintain FS roads in a certain manner. Rather, FS employees have discretion to maintain FS roads to accommodate their intended use safely and in accordance with maintenance criteria contained in the road management objectives. They develop annual road maintenance plans for all NFS roads based on road management objectives, travel analysis, and expected travel. *Id.* at pg. 26. In developing these plans, they consider both short-term and long-term needs and all sources of maintenance funding available during the fiscal year. In case of a funding shortfall, FS employees allocate available funds in order of priority established in road maintenance plans.

Nor does FSH 7709.59 contain any mandatory directives requiring FS employees to design, construct, and maintain FS roads in a certain manner. Rather, it "provides guidance for conducting planning, traffic management, investment sharing (cost share), highway safety, traffic studies, road maintenance, and other road system operations and maintenance activities." FS employees have discretion to operate and maintain the NFS road system in a manner that provides for user safety; support for resource programs; implementation of management area direction; protection of road investment, the environment, and adjacent resources; and meeting applicable air and water quality standards. FS employees develop road management objectives from the appropriate management area direction, access management objectives, and similar sources of resource management direction, standards, and guidelines. When developing road management objectives, FS employees consider (1) environmental and resource considerations;

(2) legal requirements; (3) road users; (4) vehicle characteristics; (5) traffic requirements; (6) safety; and (7) economics.

Finally, the Guidelines for Road Maintenance Levels and the GPNF Road Maintenance Plan for 2014 are relevant to the maintenance of GPNF FS roads. The Guidelines do not contain any mandatory directives for determining maintenance levels. Rather, they were developed "for the guidance" to FS employees. The Guidelines are designed to help FS employees achieve consistent application of road management and maintenance standards. They are designed as a guideline to enable the operation and maintenance of byways within the FS system in a manner which takes account of public use, including safety and enjoyment, the environment and adjacent natural and cultural resources, and agency constrains, including budget and personnel. The Guidelines track FSH 7709.58 (above), and similarly do not contain mandatory directives with respect to design, reconstruction, or maintenance of FS Roads.

In short, there are no mandatory statutes, regulations, or policies requiring FS employees to take a specific course of action in managing, designing, reconstructing, or maintaining GPNF FS roads in, or specifically FR 52.

**B. Forest Service Officials' Decisions Regarding Road Design, Reconstruction, and Maintenance Level Classification Decisions are Susceptible to Policy Analysis.**

The second, policy-based prong of the *Berkovitz* test is grounded in the notion that the discretionary function exception is designed to "prevent judicial 'second guessing' of legislative administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Kelly v. United States*, 241 F.3d 755, 760 (9th Cir. 2001) (*citing Gaubert*, 499 U.S. at 323). The relevant inquiry is not whether an explicit balancing is proved, but whether a decision is susceptible to policy analysis. *Kennewick*, 880 F.2d at 1028; *see also Prescott v. United States*, 973 F.2d 696, 703 n.5 (9th Cir. 1992); *Childers v. United States*, 40 F.3d 973, 974

n.1 (9th Cir. 1994). The decision, or non-decision, must be one that is susceptible to policy judgment and involves an exercise of political, social, or economic judgment. *Gaubert*, 499 U.S. at 325. When government policy allows a government agency to exercise its discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. *Id.* at 324; *Miller v. United States*, 163 F.3d 591, 593-94 (9th Cir. 1998).

Pursuant to FSM 7700, FS employees must consider the following objectives when managing the Forest transportation system and motor vehicle use on NFS roads:

- To provide sustainable access in a fiscally responsible manner to NFS lands for administration, protection, utilization, and enjoyment of NFS lands and resources consistent with the applicable land management plan.
- To manage the Forest transportation system, including motor vehicle use on NFS roads within the environmental capabilities of the land.
- To provide an appropriate range of recreation opportunities on NFS lands and to minimize conflicts among users of NFS lands.
- To manage the Forest transportation system to address user safety and convenience and efficiency of operations in an environmentally responsible manner and, where needed, to restore ecosystems along NFS roads designed for motor vehicle use, within the limits of current and anticipated funding levels.

FS employees "[b]alance Forest transportation facility investments and maintenance costs with current and future budgets to maintain the health of the land and water quality; provide for user safety; and provide public and administrative access." They consider and minimize effects of construction, reconstruction, maintenance, and decommissioning of Forest roads on natural and cultural resources. They identify the benefits of public access to NFS lands and the environmental costs of road-associated effects, taking into account public safety, affordability, and management efficiency. Additionally, they "ensure that road management decisions are based on consideration of environmental, social, and economic impacts."

Pursuant to FSM 7710, FS employees also "determine the minimum road system needed for sustainable public and agency access to achieve the desired conditions in the applicable land

management plan; to promote ecosystem health; and to address public safety and efficiency of operations in an environmentally sensitive manner within current and anticipated funding levels." They "consider and minimize effects of transportation facility construction, reconstruction, maintenance, and decommissioning on heritage resources, ecological processes, and ecosystem health, diversity, and productivity."

The discretion allowed under the FSMs, the FSHs, the Guidelines, and the Annual Plan, for design, reconstruction, and maintenance of FS Road 52, is of the type that Congress intended to be protected from liability and is susceptible to policy analysis. And GPNF employees specifically considered numerous policy concerns in making road maintenance decisions in 2014. Therefore, the second prong of the discretionary function exception has been met as a matter of law. Accordingly, the discretionary function exception to the FTCA applies and Ball's FTCA action is barred. The Defendants' motion to dismiss is **GRANTED**.

**C. The United States is Entitled to Summary Judgment on Plaintiff's Speed Limit Claim.**

Ball's administrative claim included an expert opinion that the FS negligently set the speed limit where the accident occurred at 45 miles per hour. But the speed limit on FR 52 is 35 miles per hour, unless otherwise posted, and the curve where plaintiff crashed was posted at 25 miles per hour. As soon as Ball crossed over from the portion of FR 52 that was maintained by Lewis County, onto the portion maintained by the FS (at milepost 3.44) a posted speed limit sign stated, "Speed Limit 35 on All Roads Within the National Forest, Unless Otherwise Posted." At milepost 10.96, the speed was posted at 45 miles per hour. At milepost 12.93, the posted speed limit was reduced to 25 miles per hour for the next mile, with a warning sign notifying drivers of curves ahead for the next mile. At milepost 14.01, the posted speed limit increased to 35 miles per hour. Ball's accident occurred on the last curve in the one-mile warning area between

milepost 13 and 14. Thus, Ball was warned to travel 25 miles per hour between milepost 13 and 14 where the crash occurred.

The FS posts signs with speeds that they expect people to follow and that they believe are a reasonable and safe speed on the road. They place warning signs to warn motorists of corners, hazards, or recommended speeds. Plaintiff admitted that he saw warning sign and 25 mile per hour speed limit sign at milepost 12.93, and he believed he was required to follow it. When asked what he understood the warning sign to mean he testified, "[w]ell, especially on the bike, the 25 means 25." He stated, "[t]hey—you have to abide by that, because if you go through a corner at 25 miles per hour—that, if you go through it at 30 or 35, you're feeling it. You're braking. You're doing things you shouldn't be doing."

The speed limit at the accident scene is 25 miles per hour. Ball has presented no evidence that 25 miles per hour is not an appropriate speed for that section of FR 52. As such, the defendants' motion for summary judgment on this point is **GRANTED**.

## IV. CONCLUSION

FS employees' decisions concerning the design, construction and maintenance of FR 52 all involve discretion of the kind that implicate the discretionary function exception to the FTCA. The Motion to Dismiss is **GRANTED**. The speed limit posted, together with the warning sign

//
//
//
//
//
//

posted, for the precise spot of the accident advises the plaintiff of reducing his speed. There is no dispute about these facts. The Motion for Summary Judgment is on this point is **GRANTED**.

Plaintiff Ball's claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

Dated this 28th day of August, 2018.

Ronald B. Leighton
United States District Judge